153 P.3d 1131

Keene H. REES, Plaintiff–Appellant,

v.

Peter CARLISLE, City and County of
Honolulu Prosecuting Attorney, in his
official and individual capacities, Defen-
dant–Appellee.

No. 26998.

Supreme Court of Hawai'i.

March 12, 2007.

Lois K. Perrin (of American Civil Liberties Union of Hawaii Foundation) and Earle A. Partington (of Law Office of Earle A. Partington), on the briefs, for plaintiff-appellant Robert Rees.

John F. Perkin and Brandee J.K. Faria, Honolulu, (of Perkin & Faria, LLLC), on the briefs, for defendant-appellee Peter Carlisle, City and County of Honolulu Prosecuting Attorney, in his official and individual capacities.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ., and Circuit Judge CRANDALL, in Place of NAKAYAMA, J., Recused.

Opinion of the Court by DUFFY, J.

Plaintiff–Appellant Robert Rees [1] appeals from the November 23, 2004 final judgment of the Circuit Court of the First Circuit,[2] granting summary judgment in favor of Defendant–Appellee Peter Carlisle, City and County of Honolulu prosecuting attorney, and against Rees on all counts, in a suit over

1. While this case was on appeal, Keene H. Rees, widow of Robert Rees, was substituted as Plaintiff–Appellant following the death of Mr. Rees.

the legality of Carlisle's use of public funds and other public resources to advocate in a state-wide general election for passage of an amendment to the Hawai'i Constitution.

On appeal, Rees makes the following arguments: (1) the circuit court erred in ruling that Carlisle's use of public funds and resources to advocate for a particular election result is authorized by state law; (2) the circuit court erred to the extent it determined that Carlisle's actions constituted government speech; (3) the circuit erred in ruling that Carlisle's actions did not violate the First Amendment to the United States Constitution or article I, section 4 of the Hawai'i Constitution; (4) the circuit court erred in finding that Carlisle's actions did not violate the equal protection clauses of the Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution; and (5) the circuit court erred in ruling that it did not have jurisdiction to consider whether Carlisle's conduct violated Revised Ordinances of Honolulu (ROH) § 3–8.6.

Based on the following, we vacate the circuit court's November 23, 2004 final judgment, and remand to the circuit court with instructions to grant Rees's motion for summary judgment on his declaratory judgment claim that Carlisle acted without legal authority when he used public funds and resources to advocate for a proposed constitutional amendment in a general election.

## I.  BACKGROUND

### A.  Factual Background

Peter Carlisle has been the elected prosecuting attorney for the City and County of Honolulu since January 1997. In 2001, Carlisle promoted a bill in the Hawai'i legislature that proposed an amendment to the Hawai'i Constitution that was intended to "permit prosecutors and the attorney general to initiate felony criminal charges by filing a written information signed by the prosecutor or the attorney general setting forth the charge in accordance with procedures and conditions to

2. The Honorable Gary W.B. Chang presided over this matter.

be provided by the state legislature." S.B. No. 996, H.D. 1, C.D. 1 (Haw.2002). This bill is often referred to as the "direct filing" bill.

Following legislative approval of the bill in 2002, Carlisle sought the opinion of the City and County of Honolulu Ethics Commission as to whether it would be appropriate under the City and County ethics laws to use City and County resources, including personnel, to work for approval of the proposed amendment. The Executive Director of the Commission, Charles W. Totto, responded, in an e-mail correspondence dated June 7, 2002, that "the short answer is yes, with some restrictions." The e-mail continued:

You informed me that [the Department of the Prosecuting Attorney] would like to advocate on behalf of a measure that will be on the state-wide election ballot this November. The issue is whether the state constitution should be amended to permit the process of "direct filing" as an alternative means to begin felony prosecutions. You envision using [the Department's] resources, such as personnel, facilities and equipment, to work for the approval of direct filing on the ballot.

ROH Sec. 3–8.6 sets forth certain restrictions on the conduct of city officers and employees regarding "Campaign assistance." "Campaign assistance" includes any service used to assist the effort to place a question on an election ballot or to approve or reject such a question. ROH Sec. 3–8.5(b)(2). As a result there are restrictions on the officers and employees who are involved in supporting the direct filing proposal. These restrictions are stated in ROH Sec. 3–8.6(c). They focus on protecting city personnel from coercion, denial of employment, discharge or demotion, harassment for failing to render campaign assistance. Further, the limitations ban promotion and other advantages as a result of an officer's or employee's rendering campaign assistance. You may want to familiarize yourself with the specific restrictions.

The ethics laws do not prohibit [the Department of the Prosecuting Attorney] from using city resources to advocate for passage of the direct filing amendment.

However, it appears that ROH Sec. 3–8.6(c) gives officers and employees the right to refuse to render campaign assistance regarding a question on an election ballot without any disadvantage to their employment resulting form [sic] such a refusal. It also ensures that personnel who render assistance will not be treated favorably compared with those who do not. Therefore, I recommend that you inform each officer or employee that he or she may opt out of the work related to the direct filing amendment without concern for any resulting reward or reprisal.

Thereafter, Carlisle campaigned extensively to promote the proposed amendment, identified as Question 3 on the November 2002 ballot, in various ways, including the expenditure of public resources and utilization of employees in his office in that effort. Carlisle admits to the following: (1) that he campaigned for the passage of Question 3 in his capacity as prosecuting attorney and not as a private citizen; (2) that he and other representatives of the Office of the Prosecuting Attorney actively advocated for passage of Question 3 in speaking engagements on sixty-six (66) separate dates between April 25 and November 4, 2002; (3) that he and fifty-seven (57) other representatives of his office sign-waved in support of Question 3; (4) that his office used public resources, including paper, copying equipment, telephones, and a website to promote passage of Question 3; (5) that the website of the Office of the Prosecuting Attorney encouraged viewers to "Vote Yes" on Question 3; (6) that in addition to the time that he and his office employees spent advocating for passage of Question 3, his office expended public resources of at least $2,404.27 in the campaign for passage of Question 3; (7) that he sent an e-mail to all employees in his office calling for their support in advocating for passage of Question 3 in their interactions with members of the public and asking for suggestions on "how to sell this concept to the public"; and (8) that while all of his office employees who participated in the campaign to promote the passage of Question 3 were volunteers, some of the volunteers were asked to work on promoting Question 3 on official work time.

The City and County was not reimbursed for the time, labor, and resources utilized by the Office of the Prosecuting Attorney in advocating for the passage of Question 3.

### B. *Procedural History*

Rees filed suit against Carlisle in his personal and official capacity on May 21, 2002, stating the following legal claims: (1) that Carlisle's activity violated Rees's constitutional free speech rights under article I, section 4 of the Hawai'i Constitution and the First Amendment to the United States Constitution and that such violation is actionable pursuant to 42 U.S.C. § 1983; (2) that Carlisle's activity violated Rees's constitutional right to a free and fair election under the due process clauses of article I, section 5 of the Hawai'i Constitution and the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983; (3) common law qui tam; and (4) that Rees is entitled to a declaratory judgment under Hawai'i Revised Statutes (HRS) § 632–1 (1993) that Carlisle's actions (a) exceeded any authority granted to the prosecuting attorney by the City Charter and were not authorized by HRS § 28–10.6, (b) were in violation of ROH § 3.8–6, and (c) violated Rees's free speech and free and fair election rights under the Hawai'i and United States Constitutions, as previously alleged. In addition to requesting a declaratory judgment regarding Carlisle's activity, Rees also requested: (1) an injunction ordering Carlisle to compensate the City for (a) all taxpayer resources used to promote passage of the amendment and (b) the portion of the salaries paid to employees of his office for time spent campaigning for passage of the amendment; and (2) an injunction prohibiting Carlisle from campaigning, requesting campaign assistance of city employees, or using taxpayer funds to campaign on ballot questions in the future.

On November 4, 2003, Carlisle filed a motion to dismiss or for summary judgment, in which Carlisle argued: (1) that Rees lacked standing to challenge Carlisle's conduct; (2) that Carlisle's actions did not constitute a "forced speech" claim actionable under 42 U.S.C. § 1983; (3) that Carlisle's actions did not constitute infringement of fundamental voting rights actionable under 42 U.S.C. § 1983; and (4) that Hawai'i law does not recognize a common law qui tam claim.

On August 6, 2004, Rees filed a motion for summary judgment and declaratory relief on the constitutional claims [3] and for declaratory relief as described earlier herein.

Both dispositive motions were argued on August 24, 2004. Disclaiming the validity of the constitutional issue raised by Rees, Carlisle's counsel asserted at the hearing that the issue of Carlisle's authority to use public funds to advocate for a ballot question was the only real issue: "[s]o you've seized on the absolute issue when you ask about authority 'cause that's really where it is.... [W]hat we have here is just a good old garden variety case of gee, did this public official have the authority to spend this money for this purpose?" Carlisle's counsel claimed that Carlisle's authority to so advocate using public funds and resources came from the City Charter, which empowered him to prosecute all offenses under the authority of the attorney general of the State: "The ordinance [sic] confides to Mr. Carlisle essentially the authority of the attorney general with regard to activities within the City and County of Honolulu concerning crime."

Following the hearing, the circuit court took the matter under advisement. On September 24, 2004, after concluding that Rees had standing to prosecute the action on the basis of his status as a taxpayer, the circuit court granted Carlisle's motion for summary judgment and denied Rees's motion, and rendered the following oral ruling:

> Turning first to the question regarding whether the defendant violated Section 3–8.6(c) of the Revised Ordinances of Honolulu, that section prohibits certain behavior relating to the coercion or solicitation of public employees in connection with campaign activities. The violation of Section 3–8.6(c) is a petty misdemeanor. Section 3–8.6(c) does not appear to create a private right of action in favor of a taxpayer's

---

**3.** Rees's summary judgment motion did not raise the qui tam claim that was part of the complaint; only the three counts raised in the motion remained in the action.

challenge to the expenditure of public funds. The adjudication of an alleged violation of Section 3–8.6(c) is properly addressed to a criminal prosecution, not a civil action. Therefore, plaintiff is not entitled to any relief pursuant to Section 3–8.6(c) of the Revised Ordinances of Honolulu.

The gravamen of the remaining claims relate to the alleged unconstitutional expenditure of public funds. The Prosecutor is an elected official who is charged with the responsibility to prosecute alleged violations of the Hawaii Penal Code. This responsibility is delegated to the Prosecutor by the Attorney General. The duties of the Prosecutor is [sic] to lobby the Legislature regarding bills that impact upon the prosecution of criminal defendants. The Prosecutor is also permitted to utilize public resources to educate the public regarding issues that relate to the topic of crime in Honolulu and other matters relating to the business of the Prosecutor's Office. Courts have recognized that public funds and resources expended in furtherance of these pursuits are not unconstitutional.

The objection plaintiff raises is that the Prosecutor did not simply educate the public regarding question 3 on the ballot, but he went too far when he urged voters to vote yes on question 3. The law not only tolerates public officials expending public funds and resources to address political issues that are germane to the business purposes of the office, but it expects such conduct. Question 3 which related to the criminal indictment process is clearly germane to the business of the Prosecutor's Office. Public officials often make remarks or public statements or take positions on matters that are germane to the business of their offices which statements or positions are objected to or disagreed with by taxpayers. This is not unusual.

When a public official from an office such as the Prosecutor's Office, which is charged with a specific mission to prosecute criminal defendants, makes a public statement on a ballot question, there is no doubt which way the Prosecutor wants the public to vote. So to draw a bright line between constitutional and unconstitutional use of public resources based upon whether or not the Prosecutor says vote yes would be an artificial and arbitrary distinction and flies in the face of the reality that every voter knows how the Prosecutor wants the public to vote on a matter such as question 3. Therefore, if the law tolerates the Prosecutor speaking on matters that are germane to the prosecution of criminal defendants, then the Constitution must allow the Prosecutor to urge both the passage of legislation pending before our Legislature and the adoption of ·ballot questions. Therefore, for these and any other good cause shown in the record, the court will respectfully grant the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment.

A final judgment was entered on November 24, 2004, and Rees filed a timely appeal.

## II. STANDARDS OF REVIEW

### A. Motion for Summary Judgment

██ We review the circuit court's grant or denial of summary judgment de novo. *Hawaii [sic] Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (second alteration in original).

*Kau v. City and County of Honolulu,* 104 Hawai'i 468, 474, 92 P.3d 477, 483 (2004).

### B. Interpretation of Municipal Charter and Ordinances

Statutory interpretation is "a question of law reviewable *de novo.*" *State v. Levi,* 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's statutory construction is guided by established rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

*Peterson v. Hawaii Elec. Light Co., Inc.,* 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

"When interpreting a municipal ordinance, we apply the same rules of construction that we apply to statutes." *Weinberg v. City & County of Honolulu,* 82 Hawai'i 317, 322, 922 P.2d 371, 376 (1996) (quoting *Bishop Square Assoc. v. City & County of Honolulu,* 76 Hawai'i 232, 234, 873 P.2d 770, 772 (1994) (quoting *Waikiki Resort Hotel v. City & County of Honolulu,*

63 Haw. 222, 239, 624 P.2d 1353, 1365 (1981))). "The purpose of the ordinance may be obtained primarily from the language of the ordinance itself[.]" *Id.*

## III. DISCUSSION

### A. Basic Claims and Defenses

Rees's legal claims are three-fold: (1) that Carlisle acted without legal authority when he used public funds and resources to advocate for passage of the proposed constitutional amendment Question 3;[4] (2) that Carlisle's conduct violated Rees's constitutional rights; and (3) that Carlisle's conduct was in violation of Revised Ordinances of Honolulu (ROH) § 3–8.6. Carlisle denies that he violated Rees's constitutional rights, and claims that Section 8–104 of the Revised Charter of Honolulu and HRS § 28–10.6 give him the legal authority to use public funds and resources to advocate for passage of the proposed constitutional amendment Question 3. In addition, Carlisle asserted a number of affirmative defenses, including: lack of standing, mootness, and failure to state a claim upon which relief can be granted. The circuit court ruled that Rees had standing to assert the claim, and Carlisle did not challenge this finding on appeal.

Since the issue of legal authority for the conduct at issue is fundamental to our analysis, we will begin with a review of Carlisle's claimed authority.

### B. The Revised Charter of Honolulu Does Not Grant Carlisle the Authority to Use Public Funds to Advocate for an Election Position.

The Revised Charter of Honolulu (RCH) sets out the prosecuting attorney's "powers, duties, and functions" in Section 8–104 (Supp. 2003), in accordance with authorizing state law. *See* HRS § 46–1.5(17) (1993) ("Each county shall have the power to provide by charter for the prosecution of all offenses and

---

**4.** In addition to challenging this claim on the merits, Carlisle argues that this point should be disregarded because the circuit court never made the "finding" in question and therefore the point of error violates Rule 28(b)(4)(C) of the Hawai'i Rules of Appellate Procedure (HRAP). We dis-

agree. The circuit court implicitly found that Carlisle's conduct was authorized by statute, and Rees's Opening Brief does state "where in the record the alleged error occurred." HRAP 28(b)(4).

to prosecute for offenses against the laws of the State under the authority of the attorney general of the State."). RCH § 8–104 provides that

> The prosecuting attorney shall:
>
> (a) Attend all courts in the city and conduct, on behalf of the people, all prosecutions therein for offenses against the laws of the state and the ordinances and rules and regulations of the city.
>
> (b) Prosecute offenses against the laws of the state under the authority of the attorney general of the state.
>
> (c) Appear in every criminal case where there is a change of venue from the courts in the city and prosecute the same in any jurisdiction to which the same is changed or removed. The expense of such proceeding shall be paid by the city.
>
> (d) Institute proceedings before the district judges for the arrest of persons charged with or reasonably suspected of public offenses, when the prosecuting attorney has information that any such offenses have been committed, and for that purpose, take charge of criminal cases before the district judges either in person or by a deputy or by such other prosecuting officer or in such other manner as the prosecuting attorney shall designate with approval of the district court or in accordance with statute; draw all indictments and attend before and give advice to the grand jury whenever cases are presented to it for its consideration; and investigate all matters which may properly come before the prosecuting attorney. Nothing herein contained shall prevent the conduct of proceedings by private counsel before courts of record under the direction of the prosecuting attorney.

RCH § 8–104 (citations omitted).

█ As the most general statement of the prosecuting attorney's powers, RCH § 8–104 provides the proper starting point for analyzing the extent of Carlisle's authority. *See, e.g. Okuda v. Ching,* 71 Haw. 140, 785 P.2d 943 (1990) (analyzing language of Honolulu Charter, section 8–104, to determine that

prosecuting attorney is empowered, in his discretion, to employ private counsel to prosecute particular cases). RCH § 8–104, which is focused on the prosecution of offenses, the institution of arrest proceedings, and court appearances, clearly lacks any express grant of power to use public funds to advocate for changes in the law. *See Marsland v. Pang,* 5 Haw.App. 463, 472, 701 P.2d 175, 184 (1985) ("The prosecutor's powers and functions are limited to those *expressly* accorded to his office by the statute creating it." (Citing 63A Am.Jur.2d *Prosecuting Attorneys* § 20 (1984).)(Emphasis added.)). Conceding that express authority is not provided by section 8–104, Carlisle argues that the "power to comment on non-partisan ballot measures that impact upon the manner in which he can initiate prosecutions is fairly implied from" his power and duty to prosecute crimes.

We agree with Carlisle that the power to publicly comment on ballot measures that implicate the manner in which he can initiate prosecutions is fairly implied from his power and duty to prosecute crimes.[5] The problem in this case is that Carlisle's conduct went far beyond providing information to the public on how the criminal justice system can be improved; he became a partisan advocate leading a battle campaign using public funds and other resources to tell voters how to vote. As noted earlier, Carlisle mobilized the Office of the Prosecuting Attorney and together they collectively advocated for the passage of Question 3 in speaking engagements on sixty-six (66) separate dates between April 25 and November 14, 2002, sign-waved on twenty (20) separate dates, prepared campaign materials in the office during business hours, urged voters to vote "Yes" on the website of the Office of the Prosecuting Attorney, and utilized public funds, labor, and resources in this overt advocacy campaign.

The distinction between providing information and blatant advocacy was made by the New Jersey Supreme Court in *Citizens to Protect Pub. Funds v. Bd. of Educ.,* 13 N.J. 172, 98 A.2d 673 (1953), a case that concerned

---

5. Of course, whether Carlisle may "comment" on such issues in a personal capacity—itself protected by the First Amendment—is not at issue; it is the expenditure of public funds for a specific election outcome that must be authorized in some fashion.

the legality of a school board's expenditure of public funds on a booklet promoting a school building program, which was to be funded by a bond measure if approved by the voters in a local referendum election. In an opinion written by then New Jersey Supreme Court Justice and future United States Supreme Court Justice William Brennan, the court ruled that while express advocacy was not permitted, the school board had implied power under its budgeting powers—which included a provision regarding school building—that "plainly embraces the making of reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal." *Id.* at 676. But rather than a fair presentation of facts, the court stated, "the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure." *Id.* at 677. This was improper, Justice Brennan explained, because

> [t]he public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature.

*Id.*

The New Jersey Supreme Court analysis is consistent with that of other jurisdictions that have considered the use of public funds to advocate in elections. In *Stanson v. Mott,* the California Supreme Court ruled that while the California Department of Parks and Recreation may have disseminated neutral information relating to the bond election without running afoul of the law, it was not authorized to "expend public funds to promote a partisan position in a general election." 17 Cal.3d 206, 209–10, 130 Cal.Rptr. 697, 699, 551 P.2d 1, 3 (1976). The California Supreme Court stated:

Indeed, every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized or on the broader ground that such expenditures are never appropriate. . . .

Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. 17 Cal.3d at 217, 130 Cal.Rptr. at 704–05, 551 P.2d at 8–9.

Having concluded that the Revised Charter of Honolulu provides neither express nor implied authority to use public funds to advocate for a proposed constitutional amendment in a general election, we now consider Carlisle's argument that such authority is provided by HRS § 28–10.6.

### C. *HRS § 28–10.6 Does Not Authorize Carlisle's Conduct Because it Does Not Apply to the Prosecuting Attorney.*

Chapter 28 of the Hawai'i Revised Statutes is entitled "Attorney General." HRS § 28–10.6 provides as follows:

**Crime research, prevention, and education; administrator and staff.** (a) The department of the attorney general shall initiate, develop, and perform or coordinate programs, projects, and activities, as determined by the attorney general, on the subject of crime, including but not limited to crime research, prevention, and education. The attorney general may:

(1) Research, evaluate, and make recommendations regarding crime, crime prevention, and the criminal justice system to the governor, the legislature, the judiciary, criminal justice agencies, or the general public, as appropriate;

(2) Develop and implement or coordinate statewide crime prevention programs and activities including:

(A) Providing crime prevention training programs for law enforcement agencies, citizens, businesses, and civic groups; and

(B) Assisting in the organization of crime prevention teams in communities to encourage the development of community crime prevention programs;

(3) Develop public education programs through various broadcast or print media to provide to the general public information that will assist citizens in developing the knowledge and confidence to prevent crime and to avoid becoming victims of crime;

(4) Establish, as deemed by the attorney general to be necessary or appropriate, citizen and government agency representative study teams to study specific crime subjects or criminal justice system problems, in order to obtain input or advice from a more specialized segment of the criminal justice or public community on those specific matters; and

(5) Establish trust funds or accounts and receive and expend financial grants and donations for crime research, prevention, or education.

(b) The attorney general may employ, without regard to chapter 76, and at the attorney general's pleasure dismiss, an administrator and other support staff necessary for the performance or coordination of the programs, projects, and activities on the subject of crime.

HRS § 28-10.6 (1993 and Supp.2002).

■ Carlisle argues that because section 8-104(b) of the Revised Charter of Honolulu gives him authority to "prosecute offenses against the law of the state *under the authority of the attorney general of the state*," RCH § 8-104(b) (emphasis added), he enjoys the same authority given to the attorney general by the legislature in HRS § 28-10.6, at least with respect to subsections (1)-(3).[6]

■ The statutory language in question does not support Carlisle's argument. HRS chapter 28 is entitled "Attorney General." HRS § 28-1 provides, among other things, that the attorney general shall appear for the State personally or by deputy, in all cases criminal in which the State may be a party or be interested. HRS § 28-2 is entitled "Prosecutes offenders, enforces bonds" and provides, among other things, that the attorney general shall prosecute offenders against the laws of the State. HRS § 28-10.6 is entitled "Crime research, prevention, and education; administrator and staff ." A review of this statutory language shows that the language is indeed specifically directed to the department of the attorney general, and its duties with respect to crime research, prevention, and education. There is no mention of the prosecuting attorney in the statute; indeed the language refers only to the attorney general's powers. Subsections (1), (2), and (3) cited by Carlisle are prefaced with "The attorney general may:" and subsection (2) refers expressly to "statewide crime prevention programs and activities," HRS § 28-10.6, although the prosecuting attorney is not a statewide officer.[7]

---

6. In his amended answer and memorandum in opposition to Rees's summary judgment motion in the circuit court, Carlisle stated that "[u]nder the authority of the attorney general, as it concerns the subject of crime, the Prosecuting Attorney's responsibilities also may include *crime research, prevention, and education,* including [those activities discussed in HRS § 28-10.6]," whose enumeration was quoted directly from HRS § 28-10.6.

7. Although we need not consult the legislative history of a law whose meaning is plain, *Peterson,* 85 Hawai'i at 327-28, 944 P.2d at 1270-71, the legislative history of HRS § 28-10.6 strengthens the conclusion that the law only applies to the attorney general. The original bill that enacted HRS § 28-10.6 was entitled "A Bill for an Act Relating to the Department of the Attorney General." S.B. No. 1800, 15th. Leg., Reg. Sess.

(1989). In addition to the provisions regarding crime research, prevention, and education, the bill also added two sections to HRS chapter 28, establishing the Hawaii criminal justice commission within the department of the attorney general and providing rule-making authority for that department. Furthermore, as a report of the Senate Judiciary Committee stated in part, "the purpose of this bill was to include the programs, projects, and activities on the subject of crime research, prevention, and education, *as functions of the Department of the Attorney General.*" Sen. Stand. Comm. Rep. No. 329, in 1989 Senate Journal, at 947 (emphasis added). This legislative history makes clear that the legislature only had in mind the department of the attorney general when it passed the law giving rise to HRS § 28-10.6.

With this clear statutory language, it cannot be seriously contended that the legislature intended to vest the Office of the Prosecuting Attorney of the City and County of Honolulu with the same powers as were granted to the state attorney general in HRS § 28–10.6.[8] The Revised Charter of Honolulu section 8–104(b) language granting the prosecuting attorney the power to prosecute offenses under the authority of the attorney general refers to the prosecutor's authority to prosecute offenses, and not the attorney general's powers given by the legislature with respect to crime research, prevention, and education. The enabling HRS provision also supports this conclusion. *See* HRS § 46–1.5(17) ("Each county shall have the power to provide by charter for the prosecution of all offenses and to prosecute for offenses against the laws of the State under the authority of the attorney general of the State."); *see also Amemiya v. Sapienza*, 63 Haw. 424, 427, 629 P.2d 1126, 1129 (1981) (stating that the prosecuting attorney shall "prosecute offenses against the laws of the State under the authority of the attorney general of the State.") (citing predecessor of RCH § 8–104).

Stated simply, the powers granted to the attorney general by the legislature in HRS § 28–10.6 do not apply to the prosecuting attorney.[9]

■ Having held that neither the Revised Charter of Honolulu nor HRS § 28–10.6 authorize the prosecuting attorney to use public funds to advocate for a proposed constitutional election, we need not address the constitutional issues raised by Rees. "A

fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *City and County of Honolulu v. Sherman*, 110 Hawai'i 39, 57 n. 7, 129 P.3d 542, 559 n. 7 (2006) (quoting *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)).

D.  *Rees's Claim Is Within the Exception to the Mootness Doctrine.*

■ Carlisle asserts that Rees's claim for declaratory relief is moot under Hawai'i law as "the conduct complained of has already occurred and there is no concrete dispute between the parties." However, there is an exception to the mootness doctrine "in cases involving questions that affect the public interest and are 'capable of repetition yet evading review.'" *Okada Trucking v. Bd. of Water Supply*, 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002). Rees's claim falls squarely within the exception as it affects the public interest and is capable of repetition yet evading review.

E.  *The Circuit Court's Conclusion That Rees Does Not Have a Right of Action Under Revised Ordinances of Honolulu Section 3–8.6 Was Not Erroneous.*

■ While we have held herein that Carlisle's conduct was without authority, which is dispositive of this case, we also pass on Rees's contention that the circuit court erred in finding that it did not have jurisdiction to consider whether Carlisle's conduct violated ROH § 3–8.6 (2002),[10] a violation of which

8.  We need not decide what powers the attorney general has pursuant to HRS § 28–10.6 as that issue is not before us in this case.

9.  It is noteworthy that the Hawai'i Attorney General, in an opinion letter dated October 24, 2002 and directed to the Office of the Public Defender, the counterpart to the prosecuting attorney, concluded that the Public Defender's Office did not have express statutory authority to make recommendations to the criminal justice system and thus stated "you or your staff *may not use state time or resources to advocate for or against Ballot Question 3.*"

10.  That section, entitled "Additional standards of conduct concerning campaign contributions and campaign assistance," provides in relevant part:

(c)  An exempt officer or employee shall not:
    (1)  Coerce, demand, or otherwise require a campaign contribution or campaign assistance from another officer or employee;
    (2)  Deny employment to a person who will not agree, as a condition of the employment, to:
        (A)  Make a campaign contribution or request a campaign contribution from another person; or
        (B)  Render campaign assistance or request another person to render campaign assistance;
    (3)  Discharge, demote, decrease the compensation of, harass, or otherwise punish another officer or employee because that officer or employee:
        (A)  Refused to make a campaign contribution or render campaign assistance when re-

would carry different penalties. In particular, Rees argues that HRS § 632-1 [11] vests the circuit court with jurisdiction to issue a declaratory judgment that Carlisle's conduct was illegal. Rees is incorrect as a matter of law.

quested or demanded by the exempt officer or employee or a third person;

(B) Sought or received an advisory opinion from the ethics commission on a possible violation of this subsection; or

(C) Filed with a public agency or officer a complaint alleging a violation of this subsection;

(4) Promise or threaten to discharge, demote, decrease the compensation of, harass, or otherwise punish another officer or employee unless that officer or employee:

(A) Makes a campaign contribution or renders campaign assistance as requested or demanded by the exempt officer or employee or a third person;

(B) Refrains from seeking an advisory opinion from the ethics commission on a possible violation of this subsection; or

(C) Refrains from filing with a public agency or officer a complaint alleging a violation of this subsection;

(5) Promote or increase the compensation of another officer or employee because that officer or employee made a campaign contribution or rendered campaign assistance when requested or demanded by the exempt officer or employee or a third person;

(6) Solicit or request a specified or minimum campaign contribution amount from another officer or employee;

(7) Request another officer or employee to provide a specified or minimum amount of campaign assistance; or

(8) Solicit or receive any campaign contribution from a person, including another officer or employee, in a building or facility during its use for official city functions.

An exempt officer or employee also shall not request or direct another exempt officer or employee to engage in an activity prohibited under this subsection.

(d) The activities prohibited under subsection (c) shall not preclude an exempt officer or employee from:

(1) Voting as the exempt officer or employee chooses;

(2) Voluntarily expressing an opinion on any political candidate, question, or issue;

(3) Voluntarily serving as a member of a political party, campaign committee, or other political organization;

(4) Voluntarily making a campaign contribution or rendering campaign assistance; or

(5) Voluntarily soliciting or requesting a campaign contribution or campaign assistance from another person, so long as the solicitation or request does not violate subsection (c).

(e) An exempt officer or employee who violates any provision of subsection (c) shall be guilty of a petty misdemeanor. The prosecution of a violation pursuant to this subsection shall be.

commenced within two years after commitment of the violation. No violation shall be prosecuted after the expiration of the two-year period. The prosecuting attorney shall be responsible for prosecution of a violation. If the prosecuting attorney becomes disqualified, the state attorney general shall have the responsibility for prosecution. The penalty of this subsection shall be in addition to the penalty provided under Section 3-8.5(a). Both penalties may be imposed for the same violation.

11. HRS § 632-1, the first section of HRS Chapter 632, "Declaratory Judgments," is itself entitled "Jurisdiction; controversies subject to," and provides:

In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.

As the circuit court noted, a violation of ROH § 3–8.6(c) is properly addressed in a criminal prosecution, as the ordinance itself specifies. The court also stated that the ordinance "does not appear to create a private right of action in favor of a taxpayer's challenge to the expenditure of public funds."

The declaratory judgment statute, HRS § 632–1, grants courts of record the power to make "binding adjudications of right" in justiciable cases, in three types of civil cases:

[1] where an actual controversy exists between contending parties, or [2] where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or [3] where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein.

HRS § 632–1. In each case, the court must be "satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding." Id.

■ As the declaratory judgment statute thus makes clear, there must be some "right" at issue in order for the court to issue relief. In *Reliable Collection Agency v. Cole*, 59 Haw. 503, 584 P.2d 107 (1978), this court incorporated the United States Supreme Court's approach from *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether "a private remedy is implicit in a statute not expressly providing one"—an analysis that also involves the determination of whether a statute creates a right upon which a plaintiff may seek relief. *Reliable*, 59 Haw. at 507, 584 P.2d at 109 (quoting *Cort*, 422 U.S. at 78, 95 S.Ct. 2080). The *Reliable* Court discussed three relevant factors used in *Cort* to make this determination:

First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted['] . . .—that is, *does the statute create a . . . right in favor of the plaintiff?* Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Id.* at 507, 584, P.2d at 109 (first emphasis in original) (quoting *Cort*, 422 U.S. at 78, 95 S.Ct. 2080). Subsequent to *Cort*, decisions of the United States Supreme Court have emphasized that "the key inquiry is whether Congress intended to provide the plaintiff with a private right of action." *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.*, 110 Hawai'i 302, 313 n. 20, 132 P.3d 1213, 1224 n. 20 (2006) (quoting *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121–22 (9th Cir.2000)). Therefore, as we recognized in *Whitey's Boat Cruises*, "we apply *Cort's* first three factors in determining whether a statute provides a private right of action though understanding that legislative intent appears to be the determinative factor." *Id. See also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("For a statute to create private rights, its text must be phrased in terms of the persons benefited."); *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.").

Nothing in the text of ROH § 3–8.6 appears to create a right protecting members of the public from the activities it prohibits. Rather, it is in the nature of "standards of conduct" for public officers. Although the public clearly benefits from the existence of such standards, it does not appear that the ordinance was passed for the special benefit of taxpayers as a group. *See Reliable*, 59 Haw. at 507, 584 P.2d at 109 ("First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted[?']" (Quoting *Cort*, 422 U.S. at 78, 95 S.Ct. 2080.)). More importantly, the ordinance clearly states that: "[t]he prosecuting attorney shall be responsible for prosecution of a violation. If the prosecuting attorney becomes disqualified, the state attorney general shall have the responsibility for prosecution." ROH § 3–

8.6(e). The ordinance also states that "[t]he penalty of this subsection shall be in addition to the penalty provided under Section 3–8.5(a)," which provides for impeachment and lesser discipline by the appointing authority, upon recommendation of the ethics commission, if the standards of conduct of Article XI of the ROH are violated. ROH § 3–8.5(a). Private enforcement of ROH § 3–8 .6 by way of declaratory judgment would not be consistent with the legislative scheme inherent in the ordinance. *See Reliable,* 59 Haw. at 507, 584 P.2d at 109 ("Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (Quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080.)).

These considerations make clear that ROH § 3–8.6 does not create a right for taxpayers, like Rees, to enforce; rather, enforcement is mandated through the prosecutor, attorney general, ethics commission, and appointing authority. Therefore, a declaratory judgment that the ordinance was violated is inappropriate, and dismissal of this claim was not erroneous.

## IV. *CONCLUSION*

Based on the foregoing, we vacate the circuit court's November 23, 2004 final judgment, and remand this matter with instructions to: (1) grant Rees's motion for summary judgment in favor of Rees and against Carlisle, in his official capacity only, on Rees's declaratory judgment claim that Carlisle lacked legal authority for his conduct; and (2) deny Carlisle's motion to dismiss and for summary judgment. However, because this is a case of first impression in this jurisdiction, and Carlisle ostensibly relied upon an opinion of the City and County of Honolulu Ethics Commission, we believe as a matter of equity that the remedial injunctive relief requested by Rees should not issue under the circumstances of this case. Further, the prospective injunctive relief requested by Rees would not appear to be necessary in view of our explication of applicable law herein. We therefore instruct the court to enter an order accordingly.

